Quynh La (SBN 341162)
Email: qla@reedsmith.com
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
T: (415) 543-8700
F: (415) 391-8269

Peter J. Chassman (*Pro Hac Application Forthcoming*)
Email: pchassman@reedsmith.com
Hallie H. Wimberly (*Pro Hac Application Forthcoming*)
Email: hwimberly@reedsmith.com
REED SMITH LLP
1221 McKinney Street, Suite 2100
Houston, TX 77010
T: (713) 469-3800
F: (713) 469-3899

*Attorneys for Plaintiff Agilent Technologies, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC., a Delaware corporation,<br><br>                 Plaintiff,<br><br>     vs.<br><br>DAVID FERRICK, an individual,<br><br>                 Defendant. | Civil Action No.:  5:23-cv-6386<br><br>**ORIGINAL COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Agilent Technologies, Inc. ("Plaintiff" or "Agilent") brings this complaint of trade secret misappropriation under the Defend Trade Secrets Act and breach of contract against David Ferrick ("Defendant" or "Dr. Ferrick").

### NATURE OF THE ACTION:

1. This is an action for: (i) trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b) and (ii) breach of contract.

2. Agilent seeks damages, injunctive relief, and declaratory relief under 35 U.S.C. § 281 et seq., 18 U.S.C. § 1836 (b)(3), and 28 U.S.C. § 2201.

### THE PARTIES

3. Agilent is a Delaware corporation with its principal place of business at 5301 Stevens Creek Blvd., Santa Clara, California 95051.

4. Upon information and belief, Defendant is an individual residing in or around 44116 Country Club Dr., El Macero, California 95618.

### JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the Defend Trade Secrets Act claim pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), because the action arises under the Defend Trade Secrets Act.

6. This Court has subject matter jurisdiction over the breach of contract claim pursuant to 28 U.S.C. § 1367, because this claim is so related to another claim in the action within the Court's original jurisdiction that it forms part of the same case or controversy.

7. Defendant is subject to personal jurisdiction of this Court at least because, on information and belief, Defendant is a resident of the state of California and, additionally and alternatively, has committed acts giving rise to this action in this judicial district.

8. Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b)(2) and Civil L.R. 3-2(e) because a substantial part of the events giving rise to these causes of action took place within this judicial district and division.

# FACTUAL BACKGROUND

## A.  Agilent

9. Agilent was established in 1999 when it was spun off from Hewlett-Packard. Headquartered in Santa Clara, California, Agilent and its subsidiaries employ approximately 18,000 people across its 32 offices worldwide.

10. Agilent is a world-leading research, development, and manufacturing company whose laboratory products and services target the food, environmental and forensics, pharmaceutical, diagnostics, chemical and energy, and research markets, among others. Agilent's solutions enable its customers to address global trends that impact human health and the environment, and to anticipate future scientific needs. Its innovative technologies provide scientists and healthcare workers tools to fight cancer, improve quality of life, and enable new discoveries. Agilent advances quality of life with a broad range of high-quality solutions to customers in 110 countries. For example, Agilent provides laboratories with instruments, services, consumables, applications, and expertise, enabling customers to achieve their research, production, therapeutic, and discovery goals. Agilent instruments, software, and sample preparation solutions help scientists at top-tier universities conduct faster, more accurate research to learn more about cancer, cardiovascular diseases, diabetes, Alzheimer's, Parkinson's, autism, and other ailments. Agilent solutions further help pathology laboratories deliver fast, accurate information to the physicians, hospitals, and medical centers they serve. Agilent solutions also provide precise answers for every segment of the pharmaceutical industry, from disease research and drug discovery to drug development, manufacturing, and quality control.

11. Agilent's Cell Analysis Division encompasses technologies related to cell imaging, real-time cell analysis, and flow cytometry, among others. Agilent's Cell Analysis Division offers customers application solutions to propel research to the next level with deeper insights into cell models and trusted quantitative results. Agilent's Cell Analysis Division engages in partnerships with other industry participants, sometimes acquiring industry participants, as it did with ACEA Biosciences, Inc. ("ACEA") and Seahorse Bioscience ("Seahorse").

12. ACEA, acquired by Agilent in 2018, invested substantial effort to invent methods for measuring and analyzing impedance of cells distributed in wells of a multi-well plate to improve researchers' ability to analyze cell behavior, such as cancer cell death in response to cytotoxic immune cells and/or therapies, in real-time. Since Agilent's acquisition of ACEA in 2018, Agilent has continued to invest substantial resources in developing this technology. Over the years, around 4,500 papers have cited Agilent's impedance technology, with 690 references cited in 2021 alone. U.S. Patent Nos. 7,192,752, 7,468,255, and 8,026,080 are just three of Agilent's patents in this innovative area.

13. Axion BioSystems, Inc. ("Axion") is a significant competitor to Agilent in the cell analysis space. Axion's Maestro products directly compete with Agilent's xCELLigence products because both systems provide real-time, high throughput impedance measurements. The extent to which Axion competes or may seek to compete with Agilent's business in the future other than its xCELLigence business is unknown.

14. On February 23, 2023, Agilent filed a lawsuit against Axion in the U.S. District Court for the District of Delaware, alleging that Axion had infringed three United States patents through various actions in relation to Axion's Maestro Platform products and that Axion had violated the Lanham Act through its false and misleading advertising stating that its Maestro Platform products combined with CytoView-Z Plates can make accurate measurements of the impedance of three-dimensional clusters of cells known as "spheroids." *See Agilent Technologies, Inc. v. Axion BioSystems, Inc.*, C.A. No. 23-198 (CJB) (D. Del.) ("Delaware Case"). Thus, Axion is both a business competitor and a litigation adversary to Agilent in the Delaware Case.

**B.     Defendant**

15. Dr. Ferrick was employed by Agilent from approximately August 2015 to January 2022, where he worked out of Agilent's Santa Clara, California office. Before his employment at Agilent, Dr. Ferrick was the Chief Scientific Officer of Seahorse. Exhibit A. When Agilent acquired Seahorse in 2015, Dr. Ferrick became an Agilent employee, holding the roles of Senior Director of Marketing and Applications followed by Associate Vice President of New Market

Development. *Id.* Dr. Ferrick played a significant role in building Agilent's Cell Analysis Division, helping with Agilent's acquisition of ACEA and Seahorse, leading strategic business initiatives to develop Agilent's Cell Analysis Division, and participating in business strategy discussions. At Agilent, Dr. Ferrick routinely worked with and had ongoing access to Agilent's confidential information, including trade secrets, including, but not limited to: (i) Agilent's market strategies, e.g., internal assessments of competitive landscape, potential partnerships, market opportunities, and potential investments; (ii) Agilent's intellectual property strategies, e.g., Agilent's internal and privileged assessments of its own patents, licensing efforts, and competitors' patents; (iii) Agilent's Internal assessments of product financials, commercialization efforts, research and development, competitive research, and marketing.

16.     On or about January 2022, Dr. Ferrick joined Axion as its Chief Scientific Officer. Exhibit B.

17.     On February 23, 2023, Agilent filed the Delaware Case against Axion.

18.     On September 15, 2023, during the course of discovery in the Delaware Case, Axion's counsel notified Agilent's counsel that, after leaving his employment at Agilent, Dr. Ferrick had retained Agilent documents (including associated data files) on his personal devices and/or accounts following his departure from Agilent and that, while Dr. Ferrick was Axion's Chief Scientific Officer, had loaded them onto Axion's computer systems, where an undetermined number of Axion employees had access to the documents.  On information and belief, Axion personnel viewed and used Agilent's documents to enable Axion to compete with Agilent in at least the field of live cell analysis.  The letter from Axion's counsel also informed Agilent's counsel that Dr. Ferrick was no longer employed by Axion, upon information and belief, placing Dr. Ferrick outside of Axion's control.

19.     In the same letter, Axion's counsel informed Agilent's counsel that it had hired Berkley Research Group ("BRG") to work with outside counsel to identify the documents retained by Dr. Ferrick and "remediate" Agilent files on Axion's systems.  Based on BRG's communications with counsel for Axion, Dr. Ferrick transferred approximately 200 files with

approximately 4,000 associated data files (collectively referred to as "documents" in this complaint) to Axion's systems, including at least Axion's Office 365 (OneDrive and SharePoint) and e-mail systems (including e-mails and attachments). According to information provided by Axion's counsel, the majority of these documents were uploaded to a network storage location on Axion's systems that was accessible to an undetermined number of, and potentially all, Axion employees, while some of the documents were uploaded to a network storage location assigned to Dr. Ferrick; and other documents were uploaded to a network storage location assigned to Jim Filippini, Axion's Chief Commercial Officer.

20. On September 19, 2023. Agilent's counsel requested that Axion's counsel provide logs of access to Agilent's documents and to ensure that derivatives of Agilent's documents have been purged from Axion's systems, but Axion has not provided this information, leaving the extent to which Axion used Agilent's confidential information unknown and, further, leaving the question of whether further dissemination or use of Agilent's confidential information has occurred or continues to occur open.

21. As a result, Agilent has been unable to determine the full scope of dissemination and use of its confidential and trade secret information or to ensure that no further dissemination or use of its information will continue to occur.

**C.      Dr. Ferrick's Contractual Obligations to Agilent**

22. As a condition of Dr. Ferrick'semployment, Agilent required that Dr. Ferrick sign an Employment Acceptance Form ("EAF") in which Dr. Ferrick expressly agreed to comply with the Agilent Standards of Business Conduct. Dr. Ferrick signed his EAF with Agilent on August 28, 2015. Exhibit C at 4.

23. Attached as Exhibit D is a true and correct copy of Agilent's Standards of Business Conduct ("SBC") that was published in a November 2019 revision, and that was in force during the time of Dr. Ferrick's employment. The SBC was created, and is maintained, in the ordinary course of Agilent's business. As seen in Section 2.1, the SBC defines sensitive information as: (i) information about Agilent's business including new product research product specifications

and designs, business strategies, customer lists, and marketing plans; (ii) nonpublic financial information including forecasts, pricing strategies, and budget information; (iii) employee information; and (iv) information about third parties including customers, suppliers, resellers, research partners, and other third parties Agilent has been entrusted to protect.  This Section reminds employees that before any employee can disclose sensitive information – either inside or outside of Agilent – the employee must ensure that: there are "good business reasons for sharing it;" they are authorized to disclose the information; they are sharing it with someone who is authorized to see the sensitive information; and they inform the recipient of the information that the information is sensitive and ensure the recipient understands the restrictions related to the use and dissemination of that information.  *Id.*  The policy places responsibility on every employee to protect sensitive information, and it notes that responsibility continues after the employee leaves Agilent.  *Id.*  Also, compliance with the SBC is mandatory for all employees, regardless of location, and the SBC expressly states that "a violation of the SBC is considered misconduct, for which employees can be subject to discipline, including immediate termination of employment at Agilent."  *Id.* at 5-6.

24.     In addition to the EAF, a contract, Dr. Ferrick signed an additional contract, entitled "Agreement Regarding Confidential Information and Proprietary Developments" ("ARCIPD") with Agilent on August 28, 2015.  Exhibit C at 6-7.

25.     The ARCIPD defines "Confidential Information" as "trade secrets, technical information, know-how, information about Agilent's organization, staffing, finance, research and development, manufacturing (including suppliers and supplier lists), and sales and marketing (including customers and customer lists), as well as information which Agilent receives from others."  *Id.*, ARCIPD ¶ 4.

26.     Under the ARCIPD, Dr. Ferrick agreed to "use Confidential Information only in the performance of [his] duties" and to "hold Confidential Information in confidence and use all reasonable precautions to ensure that Confidential Information is not disclosed to unauthorized persons or used in an unauthorized manner, both during and after my employment."  *Id.*, ARCIPD

¶ 4(a)-(b).

27. Under the ARCIPD, Dr. Ferrick also agreed: "[t]he product of all work performed by me during and in the course of my employment will be the exclusive property of my Employer; and my Employer has the sole right to use, publish, sell, license, and transfer rights in such work products, which include, but are not limited to, text (e.g. papers, articles, books), reports, documents, images, videos, drawings, computer programs, devices, and models." *Id.*, ARCIPD ¶ 7.

28. Also pursuant to the ARCIPD, Dr. Ferrick agreed that he would "not remove any Agilent property from any Agilent premises without Agilent's permission." *Id.*, ARCIPD ¶ 8.

### D. Agilent's Trade Secrets and other Confidential Information at Issue

29. Agilent's product marketing strategies, competitive analyses, product development, product timelines, financial projections, plans and information about potential mergers and acquisitions, and working templates are confidential information and trade secrets. Agilent has developed these trade secrets by making extensive investments of time and resources.

30. The documents identified as having been transferred to Axion's systems by Dr. Ferrick, as Axion's Chief Scientific Officer, include highly sensitive information comprising Agilent trade secrets and other confidential information and include at least the following categories of documents: (i) privileged documents detailing Agilent's intellectual property strategies, licensing agreements, material transfer documents and agreements, including agreements to which Agilent owes a duty of confidentiality to the other parties to the agreement, and documents referencing intellectual property of Agilent and others; (ii) trade secret documents addressing Agilent's overall market strategy for cell analysis and gene therapy in the immunology, infections disease, virology, vaccine research, and therapeutic development and production spaces, including discussion of partnerships, competitive landscape, financials, and strategy execution plans; (iii) trade secret descriptions of how Agilent's, formerly ACEA's, products, including the xCELLigence line of products, operate, and comparing those products to other products in the market; (iv) COVID-19 test development by Agilent, including marketing, project

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

commercialization, development and manufacturing, third party collaborations, and financial documents; and (v) trade secret documents concerning liquid biopsy diagnostics, including Agilent's internal assessments of market opportunities, investment review, and business cases. Many of these documents bear labels identifying them as Agilent "Private," "Confidential," and/or "Privileged."

31. To date, the Agilent documents that have been identified as retained by Dr. Ferrick in his role as Chief Scientific Officer at Axion and that he uploaded to Axion's systems include confidential information and other trade secrets, disclosing a broad swath of the business operations and market strategies for Agilent's Cell Analysis Division and relating to Agilent products or services intended for use in interstate or foreign commerce, including but not limited to Agilent's patented xCELLigence line of products of relevance to the claims of patent infringement in this action.

32. The types of information contained in the misappropriated files give Agilent a competitive edge, and Agilent derives independent economic value from this information not being generally known to or readily accessible by the public. Accordingly, Agilent keeps this information closely guarded, and certain of the information is distributed at Agilent only on a need-to-know basis. Disclosure of this information to the general public or to Agilent's competitors would severely harm Agilent, and its disclosure to competitor, Axion, has harmed Agilent. Possession of these trade secrets by a competitor would provide economic advantage to those who do not otherwise have access to the information, and, on information and belief, has provided an economic advantage to Axion and harmed Agilent. While certain of the misappropriated information concerns Axion's products that compete with Agilent's xCELLigence products, other documents relate to other Agilent business.

### E. Agilent Has Taken Reasonable Efforts to Protect its Trade Secrets

33. Agilent has taken deliberate steps to prevent inadvertent or improper disclosure of its trade secrets, including through physical security, electronic security, and personnel policies and restrictions.

34. At all times during Dr. Ferrick's employment, Agilent's physical locations, including the Santa Clara, California location, where Dr. Ferrick worked, required electronic badge access, restricting physical access only to appropriate Agilent employees and contractors.

35. During the COVID-19 pandemic, physical site access was limited to a need-only basis. Employees working remotely used Agilent-issued laptops and connected securely to Agilent's networks through a VPN. Any computer or phone used to connect to Agilent systems had specific login and password requirements to access Agilent information.

36. In addition to this physical and electronic security, Agilent has taken and continues to take routine steps to protect its trade secrets. As discussed above, Agilent required that Dr. Ferrick sign an EAF and ACRIPD, in which Dr. Ferrick expressly agreed to comply with Agilent's SBC and hold Agilent's confidential and proprietary information in confidence. *See* Exhibit C.

37. In addition to the policies and employment agreements described above, all Agilent employees are required to complete annual training regarding trade secrets and confidentiality. This includes training reviewing the SBC, and other training regarding trade secrets, confidentiality, and security awareness.

38. As part of its efforts to ensure the security of its confidential information, and for other purposes in the ordinary course of its business, Agilent creates and maintains a database of training modules completed by each employee during their employment. These records show that Dr. Ferrick completed multiple required training courses related to Agilent's Standards of Business Conduct and its Information Security practices. Specifically, through numerous separate training courses or documents, Dr. Ferrick was repeatedly reminded of Agilent's Information Security policies or SBC through "beLegal" training and SBC certifications, and he was trained on the requirements and methods for protecting Agilent's trade secrets through "beSecure" training and other Agilent training on trade secrets. These training courses and documents affirm that all Agilent information is to be presumed confidential and treated accordingly.

### F. Defendant's Breach of Contract and Misappropriation

39. Dr. Ferrick willfully breached his EAF and ARCIPD contracts with Agilent, and violated the DTSA by (i) copying Agilent files containing trade secrets and other sensitive and/or confidential information to his personal devices and/or accounts outside of Agilent; (ii) retaining Agilent files containing trade secrets and other sensitive and/or confidential information on his personal devices and/or accounts after his employment with Agilent ended in January 2022; (iii) disclosing Agilent trade secrets and other sensitive and/or confidential information by transferring said files onto Axion's systems without Agilent's express or implied consent; and (iv) on information and belief, using Agilent trade secrets and other sensitive and/or confidential information in his role as Axion's Chief Scientific Officer. Dr. Ferrick is no longer employed by Axion and, upon information and belief, he may continue to disclose and/or use Agilent trade secrets and other sensitive and/or confidential information for personal benefit or the benefit of others, if at all, is unknown.

### COUNT 1 – MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA

40. Agilent incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

41. This is a cause of action for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, based on the misappropriation of Agilent's trade secret information through wrongful acquisition, disclosure, and/or use.

42. Agilent's proprietary information at issue comprises trade secrets because the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person, such as a competitor such as Axion, who can obtain economic value from the disclosure or use of the information; and Agilent has taken reasonable measures to keep such information secret as described in the paragraphs above

43. Agilent is the "owner" of the proprietary information at issue, as the term is defined in 18 U.S.C. § 1839(4).

44. Agilent's proprietary information is used in, or intended for use in, interstate and foreign commerce. The proprietary information includes, but is not limited to: (i) privileged documents detailing Agilent's intellectual property strategies, licensing agreements, material transfer documents and agreements, including agreements to which Agilent owes a duty of confidentiality to the other parties to the agreement, and documents referencing intellectual property of Agilent and others; (ii) documents addressing Agilent's overall market strategy for cell analysis and gene therapy in the immunology, infections disease, virology, vaccine research, and therapeutic development and production spaces, including discussion of partnerships, competitive landscape, financials, and strategy execution plans; (iii) descriptions of how Agilent's, formerly ACEA's, products, including the xCELLigence line of products operate, and comparing those products to other products in the market; (iv) COVID-19 test development by Agilent, including marketing, project commercialization, development and manufacturing, third party collaborations, and financial documents; and (v) liquid biopsy diagnostics, including Agilent's internal assessments of market opportunities, investment review, and business cases.

45. Dr. Ferrick gained access to Agilent's trade secrets during an employee-employer relationship with Agilent. Dr. Ferrick was under an obligation to maintain the secrecy of Agilent's trade secret information obtained during his employment by Agilent.

46. In Dr. Ferrick's employment at Agilent, he had access to Agilent proprietary information, including, but not limited to, documents containing information about: (i) Agilent's market strategies, e.g., internal assessments of competitive landscape, potential partnerships, market opportunities, and potential investments; (ii) Agilent's business plans and projections; (iii) Agilent's intellectual property strategies, e.g., Agilent's internal and privileged assessments of its own patents, licensing efforts, and competitors' patents; (iv) Agilent's strategic agreements with third parties; and (vi) Agilent's products, e.g., Agilent's internal assessments of product financials, commercialization efforts, research and development, and marketing.

47. Before departing Agilent to become Axion's Chief Scientific Officer, Dr. Ferrick transferred numerous files containing Agilent's confidential, proprietary, and trade secret

information to his personal devices and/or accounts. After Dr. Ferrick's departure from Agilent, Dr. Ferrick introduced Agilent's electronic documents and files to Axion's systems, including but not limited to files that contained Agilent's confidential, proprietary, and trade secret information. Certain of the electronic files were marked as "Private," "Confidential," and/or "Privileged." Under Agilent's ARCIPD, which Dr. Ferrick signed on August 28, 2015, confidential information is "all information which is not generally known and to which [an employee] has access to in the course of [his] employment," including "trade secrets." This obligation by Dr. Ferrick applied, whether or not a document was marked as "Private," "Confidential," and/or "Privileged."

48. As a result of Dr. Ferrick's improper acquisition and disclosure, Agilent's confidential, proprietary, and trade secret information has been made available to Agilent's direct competitor Axion. On information and belief, Dr. Ferrick used Agilent's proprietary information during the course of his employment with Axion and may continue to use Agilent's proprietary information. On information and belief, the documents remain outside of Agilent's ability to control their dissemination, and they could be provided to another competitor or otherwise disseminated on an uncontrolled basis.

49. As a direct and proximate result of Dr. Ferrick's improper acquisition, disclosure, and, on information and belief, use of Agilent's trade secrets, Agilent has suffered actual loss from the exposure of its trade secrets, such as, upon information and belief, the advancement of Axion's Maestro and related business in competition with Agilent's business, at least in furtherance of sales of Axion's Maestro product line in competition with Agilent's xCELLigence product line, such as through, upon information and belief, Agilent's lost sales and through Axion's avoidance of head start costs, along with Agilent's costs incurred in pursuing and remedying the misappropriation. Upon information and belief, Agilent will continue to suffer loss as a result of the misappropriation.

50. These acts of misappropriating Agilent's trade secrets by Dr. Ferrick were willful, thus warranting an award of exemplary damages, as provided by 18 U.S.C. § 1836(b)(3)(C), and an award of attorneys' fees, as provided by 18 U.S.C. § 1836(b)(3)(D).

**COUNT 2 – BREACH OF CONTRACT**

51. Agilent incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

52. Agilent's EAF and ARCIPD – both signed and accepted – constitute valid contracts between Dr. Ferrick and Agilent.

53. By signing the EAF, Dr. Ferrick agreed: "I will comply with Agilent's Standards of Business Conduct." Exhibit C at 4. Agilent's SBC defines sensitive information as: (i) information about Agilent's business including new product research product specifications and designs, business strategies, customer lists, and marketing plans; (ii) nonpublic financial information including forecasts, pricing strategies, and budget information; (iii) employee information; and (iv) information about third parties including customers, suppliers, resellers, research partners, and other third parties Agilent has been entrusted to protect. Exhibit D at 13. This Section reminds employees that before any employee can disclose sensitive information – either inside or outside of Agilent – the employee must ensure that: there are "good business reasons for sharing it;" they are authorized to disclose the information; they are sharing it with someone who is authorized to see the sensitive information; and they inform the recipient of the information that the information is sensitive and ensure the recipient understands the restrictions related to the use and dissemination of that information. *Id.* The policy places responsibility on every employee to protect sensitive information, and it notes that responsibility continues after the employee leaves Agilent. *Id.* Also, compliance with the SBC is mandatory for all employees, regardless of location, and the SBC expressly states that "a violation of the SBC is considered misconduct, for which employees can be subject to discipline, including immediate termination of employment at Agilent." *Id.* at 5-6.

54. The ARCIPD defines confidential information as "all information which is not generally known and to which [an employee] has access to in the course of [his] employment. This includes, but is not limited to, trade secrets, technical information, know-how, information about Agilent's organization, staffing, finance, research and development, manufacturing

(including suppliers and supplier lists), and sales and marketing (including customers and customer lists), as well as information which Agilent receives from others." Exhibit C, ARCIPD ¶ 4.

55. The ARCIPD requires that all employees, in consideration for their employment by Agilent technologies, "use Confidential Information only in the performance of [their] duties; [and] hold Confidential Information in confidence and use all reasonable precautions to ensure that Confidential Information is not disclosed to unauthorized persons or used in an unauthorized manner, both during and after [their] employment . . . ." *Id.*, ARCIPD ¶ 4(a)-(b).

56. Also pursuant to the ARCIPD, Dr. Ferrick agreed that he would comply with Agilent's Standards of Business Conduct, which require every employee to protect sensitive information. *Id.*, ARCIPD ¶ 9.

57. Dr. Ferrick's employment with Agilent ended on or around January 2022, when he became Axion's Chief Scientific Officer.

58. Under the ARCIPD, Dr. Ferrick agreed to use all Agilent confidential information "only in the performance of my duties." *Id.*, ARCIPD ¶ 4.

59. Before departing Agilent to become Axion's Chief Scientific Officer, Dr. Ferrick transferred numerous files containing Agilent's confidential, proprietary, and trade secret information to his personal devices and/or accounts and retained them in violation of the ARCIPD and EAF. Following his departure from Agilent, Dr. Ferrick disclosed Agilent's confidential, proprietary, trade secret information to Axion, at least by introducing Agilent electronic files to Axion's systems, including but not limited to files that contained Agilent's confidential, proprietary, and trade secret information. Certain of the electronic files were marked as "Private," "Confidential," and/or "Privileged." Under Agilent's ARCIPD, which Dr. Ferrick signed on August 28, 2015, confidential information is "all information which is not generally known and to which [an employee] has access to in the course of [his] employment," including "trade secrets." *Id.*, ARCIPD ¶ 4. And under Agilent's SBC, which Dr. Ferrick agreed to comply with by signing Agilent's EAF on August 28, 2015, sensitive information is "non-public information

in any form, whether written, verbal, or electronic, to which you are exposed as part of your job." Exhibit D at 13. This obligation by Dr. Ferrick applied whether or not a document was marked as "Private," "Confidential," and/or "Privileged."

60. Accordingly, Dr. Ferrick breached his ARCIPD contract with Agilent at least by: (i) retaining files containing Agilent's confidential information following termination of his employment with Agilent; (ii) transferring files containing Agilent's confidential information to his personal devices and/or accounts; and (iii) copying Agilent's confidential information to Axion's systems.

61. Moreover, Dr. Ferrick breached his EAF contract with Agilent at least by: (i) retaining files containing Agilent's sensitive information following termination of his employment with Agilent; (ii) transferring files containing Agilent's sensitive information to his personal devices and/or accounts; and (iii) copying Agilent's sensitive information to Axion's systems.

62. As a result of Dr. Ferrick's breaches, Agilent has been harmed and incurred damages, and will continue to be harmed and to incur damages, including by dissemination of Agilent's competitive analyses, financial information, marketing information, market studies, confidential contracts, and other highly sensitive and/or confidential information to Axion, which is Agilent's competitor, in the live cell analysis market. In addition, Agilent has incurred cost in attempting to deal with the misappropriation and dissemination of its sensitive and/or confidential information. Moreover, the full extent of Dr. Ferrick's dissemination of Agilent's sensitive and/or confidential information at Axion or beyond presently is not conclusively known to Agilent.

63. As a result of Dr. Ferrick's personal acquisition of Agilent files and Dr. Ferrick's transfer of Agilent files to Axion, Dr. Ferrick and Axion are in position to further disseminate and or otherwise use Agilent's sensitive and/or confidential information for personal benefit or the benefit of others, presenting a highly dangerous situation for Agilent, both from a business perspective (e.g., giving direct competitor Axion access to Agilent's sensitive and/or confidential information) and from a legal perspective (e.g., disclosing to Axion agreements that Agilent has

with third parties to which Agilent owes a duty of confidentiality).

64. In addition, the potential damage to Agilent from Dr. Ferrick's breach of Dr. Ferrick's agreements with Agilent are not limited to those relating to Dr. Ferrick's employment at Axion because (i) Dr. Ferrick is no longer employed by Axion; and (ii) regardless of Dr. Ferrick's employment, Agilent's sensitive and/or confidential information is no longer under Agilent's control, and Dr. Ferrick could engage in disclosures other than to Axion, including by dissemination of such information to other competitors or otherwise publicly.

**PRAYER FOR RELIEF**

Wherefore, Agilent respectfully requests the following relief:

1. judgment that Defendant violated the DTSA;
2. a preliminary and permanent injunction pursuant to 18 U.S.C. § 1836(b)(3) enjoining Defendant from disclosing or using any Agilent trade secret or other Agilent confidential information to anyone, including but not limited to Axion or Axion's counsel;
3. an order pursuant to 18 U.S.C. § 1836(b)(3)(A)(ii) requiring that Defendant submit to a forensic analysis of all devices and e-mail accounts within Defendant's possession, custody and control to: a) provide Agilent complete disclosure of the dissemination of Agilent's confidential and proprietary information; and b) to ensure the complete removal of all Agilent confidential material from the possession of Defendant and others;
4. judgment that Defendant breached the EAF and ARCIPD;
5. an award of monetary damages in an amount to be proven at trial;
6. for costs of suit incurred herein;
7. for pre-and-post judgment interest;
8. for attorneys' fees and costs; and
9. for such other and further relief as this Court may deem appropriate.

**JURY DEMAND**

Agilent requests a trial by jury on all issues so triable.

| | |
|---|---|
| Dated: December 12, 2023 | Respectfully submitted, |
| | By: */s/ Quynh La* |
| | Quynh La (SBN 341162) |
| | **REED SMITH LLP** |
| | |
| | Peter J. Chassman (*Pro Hac App. Forthcoming*) |
| | Hallie H. Wimberly (*Pro Hac App. Forthcoming*) |
| | **REED SMITH LLP** |
| | |
| | ***Attorneys for Plaintiff*** |
| | ***Agilent Technologies, Inc.*** |